# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| ST. THOMAS HOSPITALITY, LLC,     ) | |
|                                          ) | |
|         Plaintiff,           ) | Case No. 3:25-cv-0017 |
|                                          ) | |
| v.                            ) | ACTION TO QUIET TITLE |
|                                          ) | |
| WILLIAM MICHAEL HANCOCK,    ) | |
|                                          ) | |
|         Defendant.         ) | |
| _____) | |

**ATTORNEYS:**

CHAD C. MESSIER, ESQ.
LISA M. KÖMIVES, ESQ.
CRAIG M. O'SHEA, ESQ.
DUDLEY NEWMAN FEUREZEIG, LLP
ST. THOMAS, U.S. VIRGIN ISLANDS
    *For Plaintiff St. Thomas Hospitality, LLC*

## MEMORANDUM OPINION[1]

**Robert A. Molloy, Chief Judge.**

Before the Court is Plaintiff St. Thomas Hospitality's ("STTH") Motion for Preliminary Injunction, filed on April 15, 2025. (ECF No. 3.) The Court held a hearing on the motion on April 29, 2025. Defendant William Michael Hancock ("Hancock") did not file a response to the motion or make an appearance. STTH presented three witnesses at the evidentiary hearing: (1) Ryan Wisehart; (2) Kenneth Schulterbrandt; and (3) Ryan Lee. For the reasons stated herein, the Court will deny STTH's motion for a preliminary injunction.

### I. FACTUAL AND PROCEDURAL HISTORY

The Court makes the following findings of fact for purposes of disposition of the pending motion.

---

[1] The Court expresses concern as to whether Hancock is being sued in this matter as a member of Eveningstar Development, LLC or as an individual. The evidence presented thus far suggests Plaintiff is attempting to sue Hancock as a member of Eveningstar Development, LLC. If so, this would destroy diversity. The Court refrains from addressing the diversity issue at this time.

STTH is a U.S. Virgin Islands limited liability company whose sole member, Amit N. Patel ("Patel"), is domiciled in the State of Florida.[2] (ECF No. 1 ¶ 3.) Hancock is a citizen of the U.S. Virgin Islands and is domiciled in the U.S. Virgin Islands. *Id.* at ¶ 4. Patel and Hancock are the only members of a U.S. Virgin Islands limited liability company named Eveningstar Development, LLC ("Eveningstar"). *Id.* at ¶ 8.

On April 15, 2025, STTH initiated this action to quiet title against Hancock asserting that Hancock was attempting to "list and sell real property to which he has no ownership interest." (ECF No. 1 at 1.)  STTH argues that it is the "record owner of Parcel No. 2-Q Remainder Estate Bakkero, No. 5 Frenchmans' Bay Quarter, in St. Thomas, Virgin Islands" ("Parcel 2-Q Remainder"). *Id.* Parcel No. 2-Q Remainder consists of "3.2080 acres more or less." (ECF No. 1 at 2.) STTH alleges that Hancock "listed three parcels improperly 'subdivided' from Parcel No. 2-Q Remainder" to "enrich himself at the expense of both [STTH] and an unsuspecting future buyer." (ECF No. 1 at 1.)

STTH moved for a temporary restraining order ("TRO") and preliminary injunction on April 15, 2025—the same day it filed its Complaint—seeking to enjoin Hancock "from any attempt to sell, encumber, or otherwise interfere with [STTH's] ownership rights to the Property until this matter may be heard on the merits."[3] *Id.* at ¶ 53. The Court denied STTH's Motion for TRO on April 17, 2025, (ECF No. 10), and on April 29, 2025, the Court held a hearing on STTH's Motion for Preliminary Injunction (the "April 29 Hearing").

### A. Ownership of Parcel 2-Q Remainder

Prior to STTH, Parcel 2-Q Remainder was owned by Eveningstar. *ECF No. 1* at ¶ 6,7; Pl.'s Ex. 1. As mentioned above, Hancock and Patel are the sole members of Eveningstar. *Id.* at ¶ 8. Patel is the managing member and holds the majority interest in the company. *Id.* at ¶¶ 9-10. According to the Complaint and testimony at the April 29 Hearing, Parcel 2-Q Remainder was purchased by Eveningstar through a loan from Rockville Hospitality, LLC,

---

[2] STTH's President, Ryan Lee, testified at the April 29, 2025, hearing that Al Patel is the sole member of STTH.

[3] STTH requests that the Court "enjoin [Hancock] from taking any action to interfere with [STTH's] title to and quiet use and enjoyment of [Parcel 2-Q Remainder] . . . including but not limited to conveying or attempting to convey the Property or portions thereof." (ECF No. 4 at 1.)

("Rockville"), a Maryland limited liability company. *Id.* at ¶¶ 16, 18. The loan "was evidenced by Promissory Note dated January 24, 2023, . . . from Eveningstar, as borrower, to [Rockville], as holder, in the original principal amount of $2,858,966.00." (ECF No. 1 ¶17.) Patel is also a member of Rockville, along with two of his cousins.[4] Testimony of Ryan Lee, Evid. Hr'g, Apr. 29, 2025. Patel is majority owner of Rockville. *Id.*

### B. Assignment of promissory note to STTH

Rockville transferred its "right, title and interest" in the promissory note to STTH by assignment on October 23, 2024. *Id.* at ¶19. According to STTH, "Eveningstar failed to make the payments required under the [promissory note], which matured and became payable in full on April 24, 2023." *Id.* at ¶20. STTH "noticed Eveningstar's default" on or about October 29, 2024, and demanded full and immediate payment of the outstanding principal balance and all accrued interest. *Id.* at ¶21.

### C. Conveyance of Parcel 2-Q Remainder to STTH

STTH acquired Parcel 2-Q Remainder from Eveningstar in November 2024. *Id.* at ¶¶ 6,7. According to STTH, Eveningstar failed to cure its default and "instead offered to convey" Parcel 2-Q Remainder to STTH in exchange for full satisfaction of the principal and interest on the promissory note. *Id.* at ¶¶ 20, 22. Eveningstar conveyed Parcel 2-Q to STTH by Quitclaim Deed dated November 8, 2024, at a value of $2,800,000.000. *Id.* at 1 ¶¶ 6, 23; *see* Pl. Ex. 1. The deed, signed by Eveningstar's managing member, Patel, was recorded on November 26, 2024. (ECF No. 1 at ¶¶ 25, 26.)

### D. Listing of Parcel 2-Q Remainder

In early 2025 Hancock contracted with real estate broker Kenneth Schulterbrandt, ("Schulterbrandt"), owner of Hang Your Hammock Properties, LLC, to list three subdivided sections of Parcel 2-Q Remainder for sale.[5] *Id.* at ¶¶ 29, 30. Two of the subdivided sections,

---

[4] Patel is majority owner of all the entities he owns, which include both Eveningstar and STTH. Testimony of Ryan Lee, Evid. Hr'g, Apr. 29, 2025.

[5] "Hancock secured possession of a preliminary map from the surveyor Brian Moseley and Associates, purporting to subdivide the Property into seven separate lots." (ECF No. 4 at 2; Pl.'s Ex. 3.) "This map was not recorded with the Virgin Islands Office of Cadastral and therefore bears no registration number from the Office of the Lieutenant Governor. Instead, it is marked 'Preliminary.'" ECF No. 4 at 3. "Based on the preliminary Subdivision Map, Hancock listed three of the purportedly subdivided properties for sale with Hang Your Hammock Properties, LLC." (ECF No. 4 at 3.) S*ee* Pl's Ex. 4, 5, 6.

Parcel 2Q-3 Estate Bakkero and Parcel 2Q-4 Estate Bakkero, were listed at $400,000 each and the third subdivided section, Parcel 2Q-5 Estate Bakkero, was listed for $325,000. *Id.* at ¶¶ 33-35. *See also* Pl's Ex. 4, 5, 6. Schulterbrandt testified at the April 29 Hearing that Hancock had approached him about one year earlier with regard to selling Parcel 2Q-3 Estate Bakkero, Parcel 2Q-4 Estate Bakkero, and Parcel 2Q-5 Estate Bakkero (the "Properties") and that they had attempted to do so "informally" before listing the Properties. Schulterbrandt further testified that Hancock represented that the Properties were owned by Eveningstar. With Hancock's endorsement, Schulterbrandt submitted the property listings to the Multiple Listing Service ("MLS") listserv[6] on April 1, 2025. Testimony of Schulterbrandt, Evid. Hr'g. Apr. 29, 2025. Subsequently, STTH sent Schulterbrandt a cease-and-desist letter. *Id.* Shortly afterwards, Schulterbrandt removed the listings from the listserv. *Id.* Schulterbrandt testified that he had never heard of STTH before receiving the cease-and-desist letter and that he was not aware that STTH owned Parcel 2-Q Remainder. *Id.* He did not perform a title search on the Properties before listing them because he had known Hancock for over ten years and did not have reason to believe Hancock lacked ownership interest in the Properties. *Id.* As of the date of the evidentiary hearing, there is no indication that the Properties were listed for sale or that Hancock was engaging in any efforts to sell the Properties.

STTH contends that Hancock "has no ownership interest" in Parcel 2-Q Remainder, no interest in any entity with an ownership interest in Parcel 2-Q Remainder, and no legal right to sell or otherwise convey any subdivided portion of Parcel 2-Q Remainder. *ECF No. 1* at ¶¶ 42-44. Pursuant to Eveningstar's operating agreement "only the majority interest holder/managing member may unilaterally execute 'deed, mortgages, bonds, contracts, leases, notes, releases, waivers, or other instruments pertaining to the Company's assets or obligations.'" *Id.* at ¶ 13. *See also* Pl.'s Ex 7. STTH further avers that Parcel 2-Q Remainder has not been "formally subdivided." *Id.* at ¶¶ 27, 28. In its motion for preliminary injunction, STTH seeks "to immediately and urgently enjoin Hancock from conveying or attempting to convey the parcels allegedly subdivided from [Parcel 2-Q Remainder]." (ECF No. 4 at 3.)

---

[6] MLS is a database containing properties for sale by real estate agents.

## II. LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. *See* Fed. R. Civ. P. 65. "A party seeking a preliminary injunction must show (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). The first and second factors are "gateway factors" that the movant *must* establish. *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 103 (3d Cir. 2022) (emphasis added). If these two gateway factors are satisfied, a court then determines whether "all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* The Court has full discretion to balance the four factors once gateway thresholds are met. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017).

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "The goal is to ensure that, at the end of the case, the court can still grant an adequate remedy." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,* 108 F.4th 194, 200 (3d Cir. 2024).

A preliminary injunction is "an extraordinary remedy," and "should be granted only in limited circumstances." *Kos Pharms.* at 708 (citation omitted). "[C]ourts must use great caution," and only grant preliminary injunctions in cases where they are "clearly indispensable to the ends of justice." *Del. State Sportsmen's Ass'n* at 199. "[A] court should not grant an injunction unless the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury." *Id.* at 200. The Supreme Court has noted that such a "drastic remedy" should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quoting 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 at 129-130 (2d ed. 1995)).

### III. DISCUSSION

#### A. Likelihood of success on the merits

To demonstrate likelihood of success on the merits requires nothing more than "a reasonable probability of eventual success." *Reilly*, 858 F.3d at 179 n.3 (citations omitted). STTH seeks to quiet title to its claimed property, Parcel 2-Q Remainder, because Hancock is allegedly attempting to sell it without authority or ownership rights to do so. (ECF No. 4 at 5, 6). To quiet title, STTH must establish title of Parcel 2-Q Remainder by a preponderance of the evidence. *Newfound Management Corp. v. Sewer*, 885 F. Supp. 727, 763 (D.V.I. 1995).

In the Virgin Islands, "[a]ny person in possession . . . of real property, may maintain an action of an equitable nature against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or interest." 28 V.I.C. § 371. "[I]n an action to quiet title the [plaintiff] must rely upon the strength of [its] own title and not upon the weakness of that of the defendants." *Dudley v. Meyers*, 422 F.2d 1389, 1394-95, 7 V.I. 472 (3d Cir. 1970).

In order to state a claim to quiet title under § 371, "plaintiff must first allege facts supporting his claim to be a person in possession of the real property at issue. Second, in order to satisfy the federal rules' notice pleading requirements, plaintiff must describe the property with enough detail such that defendant can identify it. Third, plaintiff must describe the competing claim, estate, or interest, and explain why he contends it is adverse." *RP17 Oasis, LLC v. S&T Bank*, No. 2019-104, 2020 U.S. Dist. LEXIS 99180, at *5 (D.V.I. June 5, 2020).

STTH submitted relevant documents, including a copy of title to the property at issue and a recorded quitclaim deed, (ECF No. 4-1), confirming a chain of title in support of its ownership claim. No evidence has been presented challenging the authenticity of STTH's quitclaim deed. STTH has satisfactorily alleged facts to support that it has legal title to Parcel 2-Q Remainder and has articulated the means by which it came to be in possession of the property, sufficing the first element required.

The second element is also satisfied. At the April 29 Hearing, STTH provided a professionally surveyed map of Parcel 2-Q Remainder, (ECF No. 4-2), and sufficiently described the property at issue with enough detail that Hancock could have identified it, had he appeared.

Finally, STTH satisfactorily described Hancock's competing claim. Although the subdivided property is no longer listed for sale by Hancock, Schulterbrandt—the real estate broker that Hancock used to list the property at issue—testified that Hancock indeed solicited his help to sell subdivided portions of Parcel 2-Q Remainder. STTH provided copies of the listings, (ECF Nos. 4-4 - 4-6), and a copy of a professionally surveyed map, (ECF No. 4-3), showing the properties subdivided as Hancock requested. STTH identified a competing interest and explained why it is adverse, satisfying the final element.

Thus, based on the evidence presented at the evidentiary hearing, the Court finds that STTH has demonstrated a reasonable probability of success on it claim to quiet title.

**B. Irreparable Harm**

In addition to demonstrating a likelihood of success on the merits, STTH must also demonstrate that it will suffer irreparable harm in the absence of preliminary relief. STTH must make a "clear showing of immediate irreparable injury." *Ecri v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). This requirement demands a showing that irreparable harm is "more likely than not." *Reilly*, 858 F.3d at 179; *see also Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 571 (3d Cir. 2015) ("for irreparable harm we understand . . . 'likely' to mean more apt to occur than not").

The risk of harm must not only be irreparable but also imminent. *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) ("[E]stablishing a risk of irreparable harm is not enough.") (citation omitted). "In order to be imminent, the injury cannot be remote or speculative; it must be poised to occur before the District Court can hold a trial on the merits." *Ecosave Automation, Inc. v. Del. Valley Automation, LLC*, 540 F. Supp. 3d 491, 500 (E.D. Pa. 2021) (citation omitted). Simply showing a possibility of irreparable injury fails to satisfy the second factor. *Acierno v. New Castle Cty.,* 40 F.3d 645, 655 (3d Cir. 1994).

In addition, STTH "must articulate and adduce proof of actual or imminent harm which cannot otherwise be compensated by money damages to sustain its substantial burden of showing irreparable harm." *Kamdem-Ouaffo v. Task Mgmt.,* 792 F. App'x 218, 219 (3d Cir. 2019); *see also Acierno at* 653 ("[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.") (internal quotation marks and citation omitted); *Instant Air Freight Co. v.*

*C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (The preliminary injunction "must be the only way of protecting the litigant from harm.").

That being said, "[r]eal estate has long been thought unique" and "harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages" and may be found "irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir. 1989). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor*, 266 U.S. App. D.C. 402, 836 F.2d 566, 575-76 (D.C. Cir. 1987).

STTH argues that it "faces an imminent risk of irreparable harm" to 1) its commercial viability, 2) its control and title of "its unique real property"; and 3) its goodwill and "reputation as a reliable business partner."

### 1. *Harm to commercial viability*

STTH argues it will suffer irreparable economic harm because the potential loss of Parcel 2-Q Remainder—as its "its primary asset"—threatens STTH's "commercial viability." (ECF No. 4 at 10, 12.) For support, STTH cites to *Doran v. Salem Inn, Inc.* and *Minard Run Oil Co. v. United States Forest Service*.

In *Doran*, adult businesses challenged a city ordinance that banned topless dancing. Absent preliminary relief, plaintiffs argued, they would suffer "a substantial loss of business and perhaps even bankruptcy." *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975). The Third Circuit affirmed the preliminary injunction against the city ordinance stating that "[c]ertainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Id.* Distinguishable from the instant matter is that the threat looming in *Doran*—the city ordinance banning topless nudity— was certain and in effect. In this matter, STTH's property is no longer on the market listed for sale by Hancock. Nor is there evidence that Hancock is currently engaging in any efforts to sell the property. The evidence in this case highly suggests that once Hancock received the cease-and-desist letter from STTH, he ceased engaging in any efforts to sell the property. Moreover, STTH has not argued that it will potentially go bankrupt absent a preliminary injunction as was the case with the adult businesses in *Doran*.

The case in *Minard* also does not support STTH's argument. In *Minard,* the district court found that a drilling moratorium on new drilling "irreparably harmed appellees because it infringed their property rights and threatened bankruptcy or closure for some businesses." *Minard*, 670 F.3d at 255. *Minard* supports the premise that where "interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." *Id.* at 256. In *Minard*, this was especially true of the mineral rights at stake. *Id*. The preliminary injunction in *Minard* was upheld where the district court "carefully considered and ultimately credited the testimony of several business owners that the new drilling moratorium had dramatically affected their business and would probably cause them to shut down or go bankrupt if it continued." *Minard* at 255. Like the city ordinance in *Doran*, the drilling moratorium in *Minard* was in place, ongoing, and certain. That level of imminence is not present here.

STTH avers that "an unauthorized sale of the allegedly subdivided portions of [Parcel 2-Q Remainder] by Hancock" could "frustrate, likely for years, [STTH's] ability to develop [Parcel 2-Q Remainder]." (ECF No. 4 at 11.) However, STTH provides no evidence that Hancock is presently listing subdivided sections of Parcel 2-Q Remainder for sale.

Furthermore, it is plausible that Hancock was unaware Parcel 2-Q Remainder had been conveyed to STTH at the time he attempted to list the properties for sale. According to Schulterbrandt's testimony, Hancock represented to Schulterbrandt that he was operating as a member of Eveningstar when subdividing the land and offering the subdivided lots for sale. Albeit the Court recognizes that the evidence thus far indicates Hancock was *not* operating within the parameters of Eveningstar's operating agreement by attempting to unilaterally sell Eveningstar's property without his partner's consent; however, Schulterbrandt testified that when Hancock learned that Parcel 2-Q Remainder had been conveyed to STTH, he "appeared to be shocked." The subdivided parcel map that Hancock presented to Schulterbrandt is dated April 12, 2023. *See* Pl.'s Ex. 3. The quitclaim deed conveying Parcel 2-Q Remainder is dated November 8, 2024. *See* Pl.'s Ex. 1. At the April 29 Hearing, Schulterbrandt testified that Hancock first approached him about selling the parcels "about a year ago," which would have been around April of 2024—seven months before Parcel 2-Q Remainder was conveyed from Eveningstar to STTH. If the subdivided sections

were uploaded to the MLS listserv in early April 2025, they were posted for less than one month on the MLS listserv. They are no longer posted for sale according to testimony at the April 29 Hearing. Hang Your Hammock Properties is no longer seeking a buyer on Hancock's behalf. Given these facts, the Court is not persuaded that STTH will suffer "imminent" harm to its economic viability absent a preliminary injunction.

### 2. Loss of control over "unique" real property

Next, STTH argues that "imminent unauthorized sales will result in the loss of control over STTH's real property" because of "Hancock's unlawful claim of interest." (ECF No. 4 at 12.) STTH contends that Hancock's attempted sale of STTH's property separately demonstrates a "risk of irreparable harm because Hancock seeks to dispossess [STTH] of its unique real property." (ECF No. 4 at 13.)

Again, in terms of demonstrating "imminent" harm, STTH fails to satisfy its burden here. According to testimony at the April 29 Hearing, Hancock's listings were removed from the MLS listserv and STTH's property is no longer offered for sale. As such, there is no "imminent unauthorized sale" and STTH's alleged harm from "loss of control over STTH's real property" is only speculative. "[E]ven where real property is involved, speculative injury does not constitute a showing of irreparable harm." *KP First Ave., Ltd. P'ship v. Prentiss Props. Acquisition Partners, Ltd. P'ship,* CIVIL ACTION NO. 01-1396, 2001 U.S. Dist. LEXIS 5188, at *13 (E.D. Pa. Apr. 26, 2001) (citing *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6-7 (1st Cir. 1991).

STTH appears to rely on the proposition that real property is generally unique so that any threat to real property interests constitutes irreparable harm per se. But this is not the law. "[O]utside of any intangible personal connections, property rights must have a 'unique nature' to support a claim for irreparable harm." *Davis v. Potter*, Civil Action No. 2022-0062, 2024 U.S. Dist. LEXIS 58664, at *14-15 (D.V.I. Mar. 30, 2024); *cf. Moses v. Lake*, No. 3:22-CV-0063, 2023 U.S. Dist. LEXIS 121390, at *35 (D.V.I. July 14, 2023) (finding that the disputed property did not have a "unique nature" despite the existence of fruit trees on the property that had been planted during the plaintiffs' childhoods); *see also Levine v. Fin. Freedom*, No. CV184127, 2018 U.S. Dist. LEXIS 168175, 2018 WL 4688338, at *8 (D.N.J. Sept. 28, 2018) (finding the plaintiff's unsupported assertion that the disputed property was unique did not

provide a sufficient basis for concluding that the property had a unique nature); *Wilkerson v. Wilson*, No. 19-CV-236, 2019 U.S. Dist. LEXIS 63716, at *2 n.1 (D.N.J. Feb. 13, 2019) (explaining that the general rule is that the loss of real property does not constitute an irreparable injury and that the "only exception recognized in the Third Circuit is when mineral rights associated with the property are at issue."); *cf. Minard*, 670 F.3d at 255-56 (finding that a loss of property rights constituted irreparable harm because the "unique nature" of the mineral rights at stake in the litigation meant that their loss by the movants would "probably cause [the movants] to shut down or go bankrupt . . . ."); *Goadby v. Phila. Elec. Co.*, 639 F.2d 117, 122-23 (3d Cir. 1981) (reversing a district court's finding of irreparable harm to plaintiff after the government constructed a power line on his property).

It is true, as the *Minard* Court observed, that courts have found "[a]s a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity." *Minard,* 670 F.3d at 256 n. 14 *(citing Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008)); *see also East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (excluding owner from real property constituted irreparable injury); *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001) (foreclosure causes irreparable injury because it results in loss of "unique real property"); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (condemnation of real property constitutes irreparable harm because condemnee has no adequate remedy at law); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor."). These cases suggest a presumption, but they do not establish the *per se* rule of irreparable harm that STTH urges on the Court. Although real estate "has long been thought to be unique," irreparable harm is not assumed; it must be demonstrated. *KP First Ave. at *13, *15* (finding "against a per se rule of irreparable harm in cases involving an injury to an interest in land," and instead [requiring] "a careful . . . examination of the nature of plaintiffs' interest, . . . the potential for injury, and whether monetary damages would be sufficient to assuage such an injury").

*St. Thomas Hospitality, LLC v. Hancock*
Case No. 3:25-cv-0017
Memorandum Opinion
Page 12 of 15

STTH must demonstrate a "unique nature" of property interest at risk of *imminent* irreparable harm that cannot be remedied monetarily. At the April 29 Hearing, STTH argued that Parcel 2-Q Remainder was unique because it is 3.2 "untouched acres" within boundaries of the nearby Westin Resort, and that the positioning—in light of STTH's hotel development goals—created a unique property interest that no other site can emulate. The Court is unpersuaded that this description qualifies as a "unique nature" of property interest. Even so, STTH fails to demonstrate imminent injury that cannot be remedied monetarily.

### 3. Harm to reputation and goodwill

Finally, STTH argues that absent a preliminary injunction, it will suffer irreparable harm to its reputation and goodwill because it may have to undertake "protracted" and "substantial litigation against defrauded buyers"; it will incur risk of damage to its goodwill and reputation associated with the litigation "to regain clear title"; and it will incur risk of reputational harm associated to its reliability as a business partner. (ECF No. 4 at 13, 14.)

STTH must demonstrate more than a *risk* of irreparable harm to its reputation and good will. *Acierno,* 40 F.3d at 655. The risk of protracted litigation to clear title against potential defrauded buyers is purely speculative at this point. STTH's property is not presently listed for sale. Furthermore, STTH is already involved with litigation that it initiated in efforts to clear title. The alleged risk of harm to STTH's goodwill and reputation due to the possibility of additional litigation *if* "Hancock is successful in his unlawful sales," is also purely speculative at this point.

Finally, STTH asserts that "[e]ven without potential litigation," it is likely to "suffer embarrassment and harm to its reputation by virtue of Hancock's very attempt to sell [STTH's] property casting doubt on [STTH's] reliability as a business partner." STTH contends that it has built trust with its partners, and that by Hancock attempting to sell the development property at issue, that trust is essentially undermined causing its goodwill and reputation with its partners to potentially be at risk—thereby creating irreparable harm.

STTH cites to several cases for support, but they are distinguishable[7] and unpersuasive.[8] For the same reasons discussed earlier, the Court finds that a "clear showing of immediate irreparable injury", or "presently existing actual threat" is lacking here.

### C. Balance of harms and public interest

Because Plaintiff fails to demonstrate irreparable harm, the Court need not reach the remaining two factors of the analysis.

### D. Sliding Scale

Finally, STTH argues that its overwhelming showing of success on the merits lessens its burden of demonstrating irreparable harm—and that the Court is obligated to apply a

---

[7] Plaintiff cites to K-*Mart Corp. v. Oriental Plaza, Inc.,* where injury to goodwill was found as irreparable harm in the *ongoing* visual obstruction of a retail store. It was considered irreparable harm because of concurrent lost sales and because the obstruction was "a detriment in presentation of the store to the public, detracting from the desired uniformity in appearance among K-Mart's stores across the nation." *K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir. 1989). The Court further found that "[b]eyond goodwill, the loss of revenues resulting from considerations such as diminished visibility, restricted access, less commodious parking, and the like are sufficiently problematic as to defy precise dollar quantification." *Id.* Proof provided included "photographic and testimonial evidence that the offending construction blocked public view of K-Mart's building from the highway, that it interfered with the store's 'presence' (an item bargained for in the lease negotiations), that it lessened available parking, and that it interfered with both vehicular maneuverability and pedestrian safety." *Id.* The instant matter does not entail ongoing present harm as presented in *K-Mart Corp. v. Oriental Plaza, Inc.*

[8] Plaintiff also cites to *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) and *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir. 2000). These cases deal with trademark infringement and trademark dilution, respectively. Because a trademark derives its value from the goodwill associated with it, any injury to trademark is likely to also cause irreparable harm to the goodwill of a company because the trademark is essentially a symbol of that goodwill; trademarks are not independent of goodwill in the context of trademark law. *See Zinn v. Seruga*, No. 05-cv-3572 (WGB), 2006 U.S. Dist. LEXIS 51773, at *3 n.2 (D.N.J. July 28, 2006) ("A trademark is a symbol of the goodwill connected with the business or product it represents which holds no significance without that goodwill; a purported assignment of a trademark without goodwill is invalid and is prohibited as an assignment in gross."); *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 196 (3d Cir. 1990) ("Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case."); *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 844 (6th Cir. 2013) ("Under traditional principles of trademark law, "[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.") (citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)); *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999) ("A trademark is merely a symbol of goodwill and has no independent significance apart from the goodwill it symbolizes.") (citation omitted); *Parkinson v. Robanda Int'l, Inc.,* 641 F. App'x 745, 746 (9th Cir. 2016) ("Trademarks are tangible representations of goodwill that cannot be separated from that goodwill.") (citation omitted); *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985) ("A trademark or trade name symbolizes the goodwill attaching to a business.").

"sliding scale" approach in its analysis.[9] STTH contends three of the four factors weigh so heavy in its favor that a preliminary injunction is warranted despite the paucity of irreparable harm present.

"To begin, the Third Circuit has not adopted the 'sliding scale' approach to injunction standards. In this Circuit, irreparable harm must always be present for an injunction to issue." *Radio Music License Comm., Inc. v. SESAC Inc.*, No. 12-cv-5807, 2013 U.S. Dist. LEXIS 201298, at *56 n.27 (E.D. Pa. Dec. 20, 2013). Nevertheless, a "delicate balancing," is still required of the Court. *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 920 (3d Cir. 1974); *see also Constructors Asso. of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978) ("While these factors structure the inquiry. . .no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements."). Furthermore, the district court has full discretion to balance all four factors "*once gateway thresholds are met.*" *Reilly v. City of Harrisburg*, 858 F.3d at 178 (emphasis added). [10]

Courts may consider the seriousness of the alleged irreparable injury to the plaintiff and the likelihood that injury will occur, however, "this court has consistently held that an affirmative showing of irreparable injury to a private plaintiff, or imminent threat thereof, is a necessary prerequisite to the issuance of a preliminary injunction." *Marxe v. Jackson*, 833

---

[9] The "sliding scale" standard has been defined "whereby preliminary injunctive relief may be granted upon particularly strong showing of one factor." *Conestoga Wood Specialties Corp. v. Sec'y of the United States HHS*, No. 13-1144, 2013 U.S. App. LEXIS 2706, at *4 (3d Cir. Feb. 7, 2013); *see also Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 569 (3d Cir. 2015) ("Under the ["sliding-scale" approach] . . . [t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors.'") (citations omitted).

[10] In *Reilly v. City of Harrisburg*, the Third Circuit noted a "conflicting standard": "We are aware there is an inconsistent line of cases within our Court holding that all four factors must be established by the movant and the failure to establish any element in its favor renders a preliminary injunction inappropriate." *Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017) (citations and internal quotation marks omitted). In a case-by-case analysis, the court in *Reilly* opined that "the conflicting line of cases and corresponding confusion in our Court appear to be the product of compounded subtle misinterpretations of our longstanding jurisprudence*.*" *Id.* at 177. "What would be the point of creating two gateway factors by placing elevated value on them if all are equally imperative? There would be none. And to require a moving party to prevail on all factors reads out balancing when not all factors favor that party." *Reilly*, 858 F.3d at 178-79. The four factors are to be balanced "so long as the first two factors (likelihood of success on the merits and irreparable harm) are satisfied." *Id.* at 177.

F.2d 1121, 1128 (3d Cir. 1987) (citation omitted); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000) ("In order to obtain a preliminary injunction, plaintiffs must show both (1) that they are likely to experience irreparable harm without an injunction and (2) that they are reasonably likely to succeed on the merits. A court may not grant this kind of injunctive relief without satisfying these requirements, regardless of what the equities seem to require."); *cf. Northampton Cty. Democratic Party v. Hanover Twp.,* Civil Action No. 04-CV-00643, 2004 U.S. Dist. LEXIS 7755, at *33-34 (E.D. Pa. Apr. 26, 2004) (denying a preliminary injunction where no irreparable injury was established, even where the other factors weighed in favor of issuance of the injunction); *Newark Branch, NAACP v. Millburn Twp.,* Civil Action No. 89-4219, 1990 U.S. Dist. LEXIS 17559, at *32-33 (D.N.J. Dec. 27, 1990) (denying a preliminary injunction where plaintiffs did not establish a probability of irreparable harm, even where they did show a likelihood of success on the merits).

STTH demonstrates a strong likelihood of success; however, "[a] preliminary injunction is not a shortcut to the merits," and STTH's strong showing cannot cure the absence of irreparable harm. *Del. State Sportsmen's Ass'n* at 197.

## IV. CONCLUSION

The Court finds that the 'drastic remedy" of injunctive relief is unnecessary for preserving its ability to render a meaningful judgment on the merits in this matter. Accordingly, the Court will deny STTH's motion for preliminary injunctive relief. An appropriate Order follows.

**Dated:** May 20, 2025                    /s/ *Robert A. Molloy*
                                                **ROBERT A. MOLLOY**
                                                **Chief Judge**